## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

<table>
<tr><td>

**MAURICIO BENTY**
1909 Logan Avenue
Middletown, OH 45044

         *Plaintiff,*

  vs.

**BUTLER COUNTY, OHIO**
315 High Street, 6th Floor
Hamilton, OH 45011

**JEREMIAH C. MORGAN (in his individual capacity)**
c/o Butler County Jail
442 South 2nd Street
Hamilton, OH 45011

  and

**JOEL Y. THURKILL (in his individual capacity)**
c/o Butler County Jail
442 South 2nd Street
Hamilton, OH 45011

         *Defendants.*

</td><td>

Case No.

Judge

</td></tr>
</table>

### COMPLAINT WITH JURY DEMAND

### NATURE OF ACTION

1.     This is a civil-rights action brought to redress a violent and racist attack perpetrated by two Butler County Jail corrections officers—Defendants Jeremiah C. Morgan and Joel Y. Thurkill—on Plaintiff Mauricio Benty while he was detained at the County's jail. This

action also seeks to hold Butler County and its leadership responsible for inadequate training and oversight of staff at Butler County Jail, and for adopting customs, policies, patterns, or practices leading to the brutalization of detainees, including Mr. Benty.

**PARTIES**

2.      Mr. Benty is a citizen of Butler County. He was born in Middletown, Ohio and lived there until he was around 20 years old. He moved back to Middletown in 2006 to attend Miami University in Middletown, where he served as a Senator and as a Vice President of the student government before graduating with an Associate's Degree in Social Science with a Minor in English Education in 2009. During college and after graduation, Mr. Benty co-founded and ran multiple community programs in Middletown for local youth to learn and compete at chess. He is a father and worked as a warehouse laborer before sustaining a debilitating shoulder injury as a result of the Defendants' actions. Mr. Benty was detained at the Butler County Jail for pretrial detention from March or April 2019 until approximately July 23, 2019. While there, Mr. Benty was the victim of a brutal and unprovoked attack at the hands of two corrections officers and sustained a left shoulder fracture that will continue to cause him pain and limited mobility for the rest of his life. During the attack, a corrections officer threatened Mr. Benty, "I'll knock your gold teeth out, you fucking nigger."

3.      Defendant Butler County is a unit of local government in the State of Ohio. It operates the Butler County Jail, is responsible for training and supervising corrections officers and other Jail employees, and, through its senior officials, promulgates and implements policies governing inmate and detainee supervision, discipline, and treatment.

4.      Defendant Joel Y. Thurkill is currently employed as a corrections officer at Butler County Jail in Hamilton, Ohio, and was so employed at the time of the incident giving rise to this action.

5.     Defendant Jeremiah C. Morgan is currently employed as a corrections officer at Butler County Jail in Hamilton, Ohio, and was so employed at the time of the incident giving rise to this action.

## JURISDICTION AND VENUE

6.     This action is brought under, among other laws and provisions, the Eighth and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. § 1983, to redress Defendants' deprivation of Mr. Benty's constitutional rights.

7.     Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

8.     Venue properly lies in this District under 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District.

## FACTS

9.     On or around May 27, 2019, while detained at the Butler County Jail, Mr. Benty was trying to order items from the Jail's commissary. At that time a federal inmate got into a verbal altercation with Mr. Benty and proceeded to punch him.

10.     After corrections officers intervened, they reported that *both* detainees had participated in the fight, even though Mr. Benty never struck the federal inmate. Both detainees were sent to solitary confinement for around three days.

11.     Either late night May 30, 2019 or early morning May 31, 2019, corrections officer Jeremiah C. Morgan and Sergeant Joel Y. Thurkill arrived at the H-pod cell block where both the federal inmate and Mr. Benty were being held in solitary confinement.

12.     Morgan and Thurkill took the federal inmate to the room where hearings for disciplinary tickets are customarily held. The room has a table and other furniture set-up for hearings. It has windows that allow people in the H-pod cell block to clearly see what is

happening in the room.

13.     It is standard practice to conduct hearings in this room. The federal inmate's hearing was conducted in this room, and then he was returned to his cell.

14.     Later that same night, Defendants Morgan and Thurkill took Mr. Benty out of his cell and around the corner to a hallway next to the laundry counter, supposedly to conduct a hearing. This was out of view of other people. The customary hearing room was empty and available at this time.

15.     Conducting a hearing in a hallway instead of the customary room was a deviation from standard practices.

16.     Conducting a hearing in the middle of the night was a deviation from standard practices.

17.     A few days earlier, Defendants Morgan and Thurkill had beaten another detainee so badly that he had to go to the hospital. News of this had traveled around the jail. Thurkill also had a general reputation for taking detainees outside the view of cameras and beating them up.

18.     Due to the irregular location and timing of the "hearing," and the reputation of the correctional officers, Mr. Benty became fearful that he was being set up for a beating.

19.     Defendant Thurkill conducted the "hearing." He read the disciplinary ticket to Mr. Benty and asked him to explain what happened. Mr. Benty attempted to share that the federal inmate had started the physical altercation by punching him and that he had not struck the inmate back. He tried to explain what evidence would substantiate this, including nearby camera footage and statements from detainees who had witnessed the incident. However, Thurkill kept cutting him off and would not allow him to explain this fully. Thurkill then explained the appeal process and Mr. Benty signed the disciplinary ticket. Mr. Benty believed signing the disciplinary ticket meant the "hearing" was over.

4

20.     Since Mr. Benty believed the "hearing" was over, he thought he was supposed to report back to his cell. But there was a locked door which corrections officers would have to open for him to get back to his cell. He turned in the direction of the locked door and took a few steps towards it.

21.     At that point Mr. Benty was suddenly grabbed from behind. Thurkill grabbed his head with two hands and Morgan grabbed his lower extremities with two hands. Together, the two corrections offices tried to lift Mr. Benty and bash his head into the wall. Mr. Benty braced for impact and tried to position his head to minimize injury. His shoulder ended up sustaining a direct and forceful impact as Thurkill and Morgan slammed him into the wall. Mr. Benty then slid to the ground with his back against the wall while Thurkill and Morgan repeatedly kicked him.

22.     While Mr. Benty was on the ground, his back was against the wall, so he sat down with his knees up to protect against further kicking or beating. Although he was still in a state of shock, he calmly said "You just broke my collar bone," at which point Thurkill and Morgan stopped kicking him.

23.     It was at this time that Defendant Morgan threatened "I'll knock your gold teeth out you fucking nigger." Thurkill then repeated "I will knock your gold teeth out." (Mr. Benty is Black and has gold and gold-colored dental work.)

24.     Shortly thereafter Mr. Benty was allowed to return to his cell.

25.     At no point before or during the attack did these Defendants order Mr. Benty not to return to his cell. As he turned to walk away after his "hearing," they instead immediately slammed him into the wall from behind and proceeded to kick him repeatedly.

26.     A jail nurse evaluated Mr. Benty's shoulder and thought his collarbone was broken.

5

27. After learning that the nurse had determined that Mr. Benty was seriously injured, Thurkill and Morgan took actions to cover-up their assault on Mr. Benty: they both filed use-of-force reports filled with false allegations about what had happened. The false allegations include that "Benty stated multiple times that he didn't have to listen to Sgt. Thurkill or other officers and stated that he will argue with anyone" when Mr. Benty said no such things; that "Sgt. Thurkill gave multiple verbal commands to come back" and that later the correctional officers verbally commanded Mr. Benty to sit down, when Mr. Benty was given no verbal commands before or during the assault; that Officer Morgan "placed Inmate Benty in the escort position and began to guide him back to" Thurkill, when in reality both correctional officers grabbed Mr. Benty from behind at once and immediately slammed him into the wall; that Mr. Benty tried to pull away and struggle with the correctional officers, when he did not resist the assault; and that Mr. Benty was given the disposition of the ticket after the "use of force," when in fact he signed the ticket beforehand.

28. The next day X-rays were taken that confirmed that Mr. Benty's collarbone was broken. A few days later he was sent to the Orthopedic at Trihealth in Oxford. The Orthopedic diagnosed significant breaks in two places and ordered surgery. A little over a week later Mr. Benty underwent surgery in which a plate was inserted. The orthopedic surgeon prescribed a specific pain medication. But when Mr. Benty returned to Butler County Jail, he was not allowed any medicine except ibuprofen. His pain at this time made his shoulder feel numb, heavy, and like a sandbag.

29. Mr. Benty has had significant pain and limited mobility in his left shoulder ever since.

30. The day after the attack, when Mr. Benty received his hour out of solitary

6

confinement, he went to the electronic kiosk and sent messages (called "kites") to the lieutenant and the warden reporting that he had been attacked by Thurkill and Morgan and asked for a grievance form. The lieutenant and/or the warden told him there was no grievance form or formal grievance process and that sending him a kite through the kiosk was the grievance process. Mr. Benty communicated his grievance fully through kites to the lieutenant and warden.

31.     The warden wrote back that he would look into the grievance, but he never followed up. Mr. Benty sent him more kites trying to get renewed attention to the grievance, but the warden never responded again.

32.     The lieutenant spoke to Mr. Benty about the grievance in person but, upon information and belief, took no further action. Mr. Benty sent additional kites to the lieutenant trying to get renewed attention to the grievance, but the lieutenant never responded again.

33.     Mr. Benty's family members also called Butler County Jail staff to report the attack.

34.     On November 4, 2020, after Mr. Benty was released from incarceration, he underwent another surgery on his left shoulder to address the irritation the inserted plate was causing. During the surgery, six screws were removed, but the pin could not be removed because flesh had grown around the injury.

35.     Mr. Benty has been in constant pain since the original injury and has experienced a significant loss of mobility. Mr. Benty's doctor told him he will have pain for the rest of his life. Since it affects a nerve, the pain has spread down to his abdomen and will spread down his leg in the future. As Mr. Benty ages, the pain will likely get more difficult to manage as he loses strength. This will likely require regular medical intervention and physical therapy.

36.     Before this injury, Mr. Benty earned income as a physical laborer, primarily in warehouses. Due to his injury, he is now unable to do physical labor for the rest of his life, and as a result has lost substantial income as well as his livelihood.

37.     Mr. Benty was under Defendants' care, custody, and control during the entire incident. He thus was wholly dependent on the Defendants' care.

38.     The Butler County Jail had a custom, policy, and practice governing their use of force on detainees, as demonstrated by the attack on Mr. Benty and similar attacks on numerous other detainees.

39.     Defendants' failure to adopt adequate practices to ensure the safe use of force on Mr. Benty and others is appalling and conforms with a disturbing pattern and practice of civil rights violations. Mr. Benty's counsel have received reports from eight other individuals who have shared that they were beaten by correctional officers in a similar matter while held at Butler County Jail, even though many of the individuals are afraid of facing retaliation for revealing what happened to them. All these beatings happened over the past several years. Most recently, an individual was beaten up for praying. It is a systemic problem at Butler County Jail. For a specific and detailed example, see pending case *Bayong, et al v. County of Butler of the State of Ohio, et al,* 1:20-cv-00989-TSB, regarding a civil rights violation at Butler County Jail where correctional officers repeatedly assaulted and used racial slurs against Mr. Ahmed Adem and Mr. Bayong Brown Bayong. Defendants have repeatedly taken similar actions (and failed to take preventive action) that result in serious bodily injury and the risk of death to inmates and detainees.

40.     Defendants were and are well aware of systemic failings with regard to their use of excessive force at the Butler County Jail, having received reports concerning the above-referenced incidents and numerous other similar incidents detailing the use of excessive force at the jail. These incidents and reports demonstrate that, for many years, the Butler County

Jail has had a custom, policy, and practice of providing inadequate training regarding the use of excessive force on people confined at Butler County Jail and that it responds with deliberate indifference when such incidents occur.

41.     The frequency and severity of the reported incidents lead to the inescapable conclusion that Defendant Butler County has failed to properly train and supervise the staff at Butler County Jail, and that this failure proximately resulted in Defendants' corresponding failure to provide a reasonable standard of care to Mr. Benty throughout his detention and in Defendants' multiple, serious violations of his civil rights.

## CLAIM 1

### FIFTH AND FOURTEENTH AMENDMENT EXCESSIVE-FORCE VIOLATION UNDER 42 U.S.C. § 1983 (AGAINST DEFENDANTS THURKILL AND MORGAN IN THEIR INDIVIDUAL CAPACITY)

42.     Plaintiff repeats and realleges the foregoing paragraphs as if fully stated here.

43.     Defendants are persons for the purposes of 42 U.S.C. § 1983.

44.     At all relevant times, all Defendants were acting under color of state law.

45.     The Due Process Clauses of the Fifth and Fourteenth Amendment guarantee the right to be free from the use of unreasonable force on people held in pretrial criminal detention.

46.     The constitutional rights of people in pretrial criminal detention are at least as great as those of people who have been criminally convicted. Indeed some courts have recognized the rights of people in pretrial detention to be greater than those of people who have been criminally convicted.

47.     The force the Defendant corrections officers used on Mr. Benty was objectively unreasonable. Mr. Benty had done nothing to warrant the use of even minimal force, but nevertheless was set up for an unprovoked beating.

48. The Defendants' conduct was harmful and sufficiently serious to reach constitutional dimensions. And the threats "I'll knock your gold teeth out you fucking nigger!" from Morgan and "I will knock your gold teeth out" from Thurkill demonstrate both Defendants' culpable state of mind.

49. Defendants' racist attack is repugnant to society's conscience and sensibilities.

50. Defendants' actions involved the unnecessary and wanton infliction of pain and are incompatible with evolving standards of decency.

51. The force purposefully or knowingly used against Mr. Benty was objectively unreasonable, proximately caused serious and permanent bodily injury, and violated Plaintiff's Fifth and Fourteenth Amendment rights.

## CLAIM 2

### EIGHTH AMENDMENT EXCESSIVE-FORCE VIOLATION
### UNDER 42 U.S.C. § 1983
### (AGAINST DEFENDANTS THURKILL AND MORGAN IN THEIR INDIVIDUAL CAPACITY)

52. Plaintiff incorporates all previous allegations.

53. Defendants Thurkill and Morgan acted maliciously and sadistically to cause an unnecessary and wanton infliction of pain on Mr. Benty, which served no legitimate penological purpose.

54. Defendants Thurkill and Morgan intentionally caused the unnecessary and wanton infliction of pain by slamming Mr. Benty into a wall and causing serious injury to his shoulder, and by repeatedly kicking him when he was on the floor.

55. Defendants' actions served no legitimate penological purpose and did not represent a good-faith effort to maintain or restore discipline. Mr. Benty made no aggressive movements or comments before Defendants struck. Nothing justified Defendants' use of any force against this compliant, peaceful detainee—let alone the injurious force they deployed by

slamming Mr. Benty into a wall and seriously injuring his shoulder. Nothing justifies that use of force, which was unnecessary, gratuitous, sadistic, malicious, and objectively unreasonable.

56.     Defendants' use of excessive force caused Mr. Benty to sustain objectively serious injuries. Mr. Benty's eventual medical treatment for these injuries included surgery for the clavicle fracture, which included having a plate screwed to his collarbone. Future surgeries are anticipated.

57.     Under the Ohio Department of Rehabilitation and Correction use-of-force policy, corrections officers may use deadly force only when the corrections officer reasonably believes that such force is necessary to protect himself or herself or another from death or serious physical harm being caused or threatened by an inmate or another person, to prevent or halt the commission of an escape, to apprehend an escapee, or to prevent loss of control of the institution or a significant part of it, or in order to regain such control.

58.     Defendants' blatant disregard of written policy and use-of-force training caused Mr. Benty unreasonable physical, mental, and emotional pain.

59.     As a direct and proximate result of Defendants' unlawful and cruel conduct, Mr. Benty suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including but not limited to loss of the ability to work and consequent loss of income as well as mental, emotional, and physical pain and suffering.

60.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 3

### FOURTEENTH AMENDMENT EQUAL-PROTECTION VIOLATION UNDER 42 U.S.C. § 1983 FOR INTENTIONAL RACE DISCRIMINATION
### (AGAINST DEFENDANTS THURKILL AND MORGAN IN THEIR INDIVIDUAL CAPACITY)

61.     Plaintiff incorporates all previous allegations.

62.     Defendants Thurkill and Morgan violated Mr. Benty's right to equal protection by assaulting him, as described above, based on his race.

63.     As Defendants slammed Mr. Benty into a wall, seriously injuring his shoulder, Defendant Morgan threatened "I'll knock your gold teeth out you fucking nigger." Thurkill then repeated "I will knock your gold teeth out."

64.     Mr. Benty, an African-American man, was treated differently from other similarly situated white detainees, including the white federal inmate for whom the Defendants Thurkill and Morgan held a peaceful disciplinary hearing immediately before assaulting Mr. Benty. The similarly situated white detainee was not brutally assaulted and subjected to racial slurs.

65.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including but not limited to lost income as well as mental, emotional, and physical pain and suffering.

66.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 4

### CIVIL DAMAGES FOR CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60(A)(1) (AGAINST DEFENDANTS THURKILL AND MORGAN IN THEIR INDIVIDUAL CAPACITY)

67.     Plaintiff incorporates all previous allegations.

68.     The conduct complained of above constitutes criminal acts on the part of

Defendants Thurkill and Morgan. Such acts give rise to civil liability that is nowhere expressly excluded by law. Defendants' crimes include, but are not limited to,

    a.    felonious assault (Ohio Rev. Code § 2903.11(A));

    b.    interfering with civil rights (Ohio Rev. Code § 2921.45(A));

    c.    dereliction of duty (Ohio Rev. Code § 2921.44(C)(2)-(3)); and

    d.    unlawful restraint (Ohio Rev. Code § 2905.03(A)).

69.    As a direct and proximate result of Defendants' criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, Plaintiff has suffered and will continue to suffer economic and non-economic damages for which Defendants Thurkill and Morgan are liable, including but not limited to lost income, mental, emotional, and physical pain and suffering, and punitive damages.

70.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 5

### INTENTIONAL TORT—ASSAULT (AGAINST DEFENDANTS THURKILL AND MORGAN IN THEIR INDIVIDUAL CAPACITY)

71.    Plaintiff incorporates all previous allegations.

72.    Defendants' intentional actions caused Plaintiff reasonable apprehension of an immediate harmful or offensive contact.

73.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

74.    Defendants' acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 6

### INTENTIONAL TORT—BATTERY
**(AGAINST DEFENDANTS THURKILL AND MORGAN IN THEIR INDIVIDUAL CAPACITY)**

75.     Plaintiff incorporates all previous allegations.

76.     Defendants engaged in the above-described actions intending to cause harmful physical contact. The resulting harmful and offensive physical contact was unlawful, unwanted, and unjustified.

77.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including but not limited to lost income as well as mental, emotional, and physical pain and suffering.

78.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 7

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(AGAINST DEFENDANTS THURKILL AND MORGAN IN THEIR INDIVIDUAL CAPACITY)**

79.     Plaintiff incorporates all previous allegations.

80.     In conducting themselves as they did, Defendants Thurkill and Morgan either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to Plaintiff.

81.     Defendants' conduct in slamming Plaintiff into a wall, and then repeatedly kicking him when he was on the floor, was extreme and outrageous. Defendants' statements to Plaintiff

that "I'll knock your gold teeth out you fucking nigger" and "I will knock your gold teeth out" were also extreme and outrageous. Their conduct went beyond all possible bounds of human decency and was such that it could be considered intolerable in civilized society.

82.    In conducting themselves as they did, Defendants either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to Plaintiff.

83.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer mental anguish so serious and of such a nature that no reasonable person could be expected to endure it and for which Defendants are liable.

84.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 8

### AIDING AND ABETTING UNLAWFUL RACE-BASED DISCRIMINATION UNDER OHIO REV. CODE § 4112.02(J)
### (AGAINST DEFENDANTS THURKILL AND MORGAN IN THEIR INDIVIDUAL CAPACITY)

85.    Plaintiff incorporates all previous allegations.

86.    Defendants threatened Mr. Benty with racial slurs while physically assaulting him.

87.    Defendants denied Mr. Benty, and assisted each other in denying Mr. Benty, the full enjoyment of the accommodations, advantages, facilities, and privileges of the Butler County Jail, a public housing accommodation, based on Mr. Benty's race.

88.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which these

Defendants are liable, including but not limited to lost income as well as mental, emotional, and physical pain and suffering.

89.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 9

### FEDERAL CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983
### (AGAINST ALL DEFENDANTS)

90.     Plaintiff repeats and realleges the foregoing paragraphs as if set forth herein.

91.     The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials, and the Due Process Clause of the Fifth and Fourteenth Amendments guarantees the right to protection from the use of unreasonable force on persons held in immigration or other civil detention. To protect against cruel and unusual punishment and ensure only reasonable use of force, a detention provider must ensure that its staff is adequately trained and supervised.

92.     The constitutional rights, including the right to protection from cruel and unusual punishment, of people in pretrial detention are clearly established, and any reasonable supervisor at a facility confining people in pretrial detention would be aware that people confined to pretrial detention have the right to be free from cruel and unusual punishment.

93.     Butler County adopted, enforced, and acquiesced in a policy, custom, and practice of failing to adequately train and supervise staff at the Butler County Jail.

94.     The need for proper supervision and training was obvious and the pattern of constitutional violations was so pervasive that the failure to supervise and train constituted deliberate indifference.

95.     As a direct and proximate result of Butler County's policy, custom, and practice of failing to adequately supervise and train staff at the Butler County Jail, Mr. Benty was subjected to cruel and unusual punishment and suffered other constitutional injury.

96.     Because of these violations of his constitutional rights, Mr. Benty is entitled to compensatory and punitive damages from Butler County under 42 U.S.C. § 1983.

## PRAYER

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Issue a judgment against Defendants in an amount to be determined at trial, including compensatory and punitive damages in an amount that is fair, just, and reasonable;

b. Award Plaintiff the cost of this action;

c. Award Plaintiff pre- and post-judgment interest, as permitted by law;

d. Award Plaintiff reasonable attorneys' fees;

e. Declare that:

    i. Defendants have a custom, policy, or practice of failing to adequately supervise and train staff at Butler County Jail with deliberate indifference to those individuals' rights.

    ii. Defendants caused Plaintiffs' injuries in violation of the Fifth, Eighth, and Fourteenth Amendments.

    iii. Defendants' failure to adequately supervise and train staff regarding the use of excessive force resulted in great physical pain and suffering, severe emotional distress, and permanent physical injury to Mr. Benty; and

f. Grant Plaintiff such other relief as the Court deems appropriate and just.

Dated: May 28, 2021

Respectfully submitted,

/s/ *Donald P. Screen*
Donald P. Screen (0044070)
The Chandra Law Firm LLC
1265 W. 6th St., Suite 400
Cleveland, OH 44113
216.578.1700 Phone
216.578.1800 Fax
Donald.Screen@ChandraLaw.com

/s/ *Amy E. Norris*
Amy E. Norris (pro hac vice forthcoming)
NORRIS LAW GROUP
616 E Street N.W.
Suite 1156
Washington, DC 20004
(202) 830-1225
amy@mwlc.org

/s/ *Anna Nathanson*
Anna Nathanson (pro hac vice forthcoming)
NORRIS LAW GROUP
616 E Street N.W.
Suite 1156
Washington, DC 20004
(202) 830-1225
anna@norrislawgroup.org

*Attorneys for Plaintiff*

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues triable under law.

/s/ *Donald P. Screen*