**IN THE UNITED STATES DISTRICT COURT**
**THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Mauricio Benty | : | Case No. 1:21-cv-00364 |
| Plaintiffs, | : | Judge Jeffery P. Hopkins |
| v. | : | |
| County of Butler, Ohio, *et al.* | : | |
| Defendants. | : | |

---

**DEFENDANTS' PROPOSED UNDISPUTED FACTS**

---

In accordance with this Court's August 23, 2024 Order, as well as Civil Standing Order I.(F)(b), Defendants, Butler County, Ohio, Jeremiah C. Morgan, and Joel Y. Thurkill, propose the following undisputed facts in connection with their previously filed Motion for Summary Judgment:

1. Plaintiff Mauricio Benty was booked into the Butler County Jail on April 25, 2019 in connection with charges of having weapons while under disability and possession of cocaine. (Benty, Doc. 35, PageID1048-49).

2. Mr. Benty was denied bond in April 2019 because his urine test was positive for drugs. (Benty, Doc. 35, PageID1050).

3. At the time of his April 2019 booking, Mr. Benty had previously been diagnosed with depression, bipolar disorder, schizophrenia, and anxiety. (Benty, Doc. 35, PageID1103-04).

4. Prior to his April 2019 booking, Mr. Benty received social security disability benefits for his bipolar disorder and schizophrenia diagnoses. (Benty, Doc. 35, PageID1119-20).

5. Since his 2019 release from the Butler County Jail, Mr. Benty has not received any new or additional mental health diagnoses. (Benty, Doc. 35, PageID1107).

6. Prior to his April 2019 booking, Mr. Benty had been prescribed mental health or psychiatric medications, and he had been hospitalized for mental health reasons on more than one occasion. (Benty, Doc. 35, PageID1104-05).

7. On May 23 2019[1], Mr. Benty pleaded guilty to the charges of having weapons while under disability and possession of cocaine. (Benty, Doc. 35, PageID1050-51).

8. Mr. Benty was sentenced to 18 months in prison for his having weapons while under disability and possession of cocaine convictions. (Benty, Doc. 35, PageID1051).

9. Mr. Benty was released from the Butler County Jail on July 16, 2019. (Benty, Doc. 35, PageID1051).

10. Mr. Benty's April-July 2019 incarceration at the Butler County Jail was his fourth incarceration in that facility. (Benty, Doc. 35, PageID1047-48).

11. At the Butler County Jail, there are thirteen sergeants and three lieutenants providing direct supervision to corrections officers, and there is also a Warden who reports up the chain of command to the Sheriff. (Rule 30(b)(6), Doc. 33, PageID856-57, 866-67; Thurkill, Doc. 27, PageID200-02; Morgan, Doc. 29, PageID574-75, 578-79).

12. On any given shift at the Butler County Jail, there are approximately three supervisors assigned. (Shift Assignment, Doc. 39-2).

13. On May 10, 2019, Butler County Jail mental health professionals, called forensics, documented in Mr. Benty's "forensics inmate medical record" that Mr. Benty "presented with delusional thought." (Forensics Record, Doc. 35-5, PageID1147).

14. Mr. Benty was issued a disciplinary ticket on May 21, 2019 for his failure to stop using the kiosk during meal pass. (Benty, Doc. 35, PageID1058).

15. Mr. Benty does not recall what time of day his hearing over the May 21, 2019 disciplinary ticket was conducted. (Benty, Doc. 35, PageID1058-59, 1061-62).

16. Prior to his May 29, 2019 altercation with federal inmate Bruce Felix, Mr. Benty asked to be moved into a different housing unit due to alleged issues with other inmates stealing Mr. Benty's belongings. (Benty, Doc. 35, PageID1055, 1057-58, 1101).

17. On May 28, 2019, Mr. Benty submitted a kiosk entry ("kite") requesting to move pods because inmates were allegedly stealing his belongings. (Benty, Doc. 35, PageID1055).

---

[1] The docket information for *State of Ohio v. Benty*, Butler County Common Pleas Court Case No. CR 2018-05-0852, is publicly available. Butler County Clerk of Courts, *CourtView*, https://clerkservices.bcohio.gov/eservices/searchresults.page?x=FHgLgV2xdnpgFcNHguEoHxhZ SA7VCi5FJ9mc6xo*sTBXYbARuet*j7Z2uf8ESMW9pe9qCP0lOyXvT8GRv7DlJw (last accessed Aug. 27, 2024). This Court "may take judicial notice of proceedings in other courts of record" and accept the contents of the public docket per Fed. R. Evid. 201(b) and (c). *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980); *see also Lech v. Third Fed. S&L Ass'n of Cleveland*, No. 2:13-cv-518, 2013 U.S. Dist. LEXIS 180626, *4 n. 2 (S.D. Ohio, Dec. 27, 2013).

18.  On May 28, 2019, Mr. Benty submitted a kiosk entry ("kite") requesting to speak with forensics staff because he wanted to move housing units due to his personal items going missing. (Benty, Doc. 35, PageID1101).

19.  On May 29, 2019, at approximately 1:26p.m., Mr. Benty submitted a kiosk entry ("kite") stating, "Requested to move pods several times to avoid altercation with certain CO, porters, and inmates of whom stolen *[sic]* from me." (Benty, Doc. 35, PageID1055; *see also* id. at PageID1056-58).

20.  An altercation between Mr. Benty and a federal inmate, Bruce Felix, occurred in the F Pod the night of May 29, 2019. (Benty, Doc. 35, PageID1057, 1066-67; Incident Report, 35-2).

21.  Neither Sergeant Joel Thurkill nor Corrections Officer Jeremiah Morgan witnessed the May 29, 2019 altercation between Mr. Benty and Mr. Felix. (Benty, Doc. 35, PageID1070; Thurkill, Doc. 27, PageID419-421; Morgan, Doc. 29, PageID656-57, 659; Incident Report, Doc. 35-2; McCampbell, Doc. 46-4, PageID1380).

22.  Both Mr. Benty and Mr. Felix were placed in handcuffs after the officer response to the May 29, 2019 altercation between the two inmates. (Benty, Doc. 35, PageID1069; Incident Report, Doc. 35-2).

23.  Both Mr. Benty and Mr. Felix were seen by a medical professional at the jail after the May 29, 2019 altercation. (Benty, Doc. 35, PageID1069; Incident Report, Doc. 35-2).

24.  Mr. Benty did not engage with the medical professional who responded to the May 29, 2019 inmate altercation about what occurred during the altercation. (Benty, Doc. 35, PageID1069-70).

25.  Mr. Benty was visited by the jail's mental health professionals, called forensics, after his May 29, 2019 altercation with Mr. Felix, but Mr. Benty did not tell the mental health professionals about the altercation. (Benty, Doc. 35, PageID1101).

26.  Mr. Benty was moved to the jail's H Pod on May 29, 2019 after the inmate altercation, while Mr. Felix remained in the F Pod. (Benty, Doc. 35, PageID1069; Incident Report, Doc. 35-2).

27.  Mr. Benty was issued a disciplinary ticket by Corrections Officer Wolford Jenkins for the May 29, 2019 altercation with Mr. Felix. (Benty, Doc. 35, PageID1070; Ticket, Doc. 27-18 and Doc. 35-1).

28.  The violations listed on Mr. Benty's May 29, 2019 disciplinary ticket addressed the jail's prohibitions against inmates fighting with any other inmate and participating in any act constituting a threat to the facility, its staff, other inmates, visitors, or the inmate himself. (Ticket, Doc. 27-18 and Doc. 35-1; *see also* Thurkill, Doc. 27, PageID358; Morgan, Doc. 29, PageID642-43; Inmate Handbook, bates 002991-92).

29.  Mr. Benty checked the box on his May 29, 2019 disciplinary ticket to request an official hearing over the ticket and Mr. Benty signed the ticket. (Ticket, Doc. 27-18 and 35-1; *see also* Benty, Doc. 35, PageID1065-66).

30.  Per jail protocol, as stated on the disciplinary ticket form, an inmate who wants to receive a hearing over their disciplinary ticket must specifically check the box on the ticket to request a hearing and sign the ticket. (Benty, Doc. 35, PageID1063-64, 1065-66; *see also* id. at 1070; Ticket, Doc. 27-18 and 35-1; Thurkill, Doc. 27, PageID359, 365-67).

31.  Per jail protocol, as stated on the disciplinary ticket form, an inmate who does not sign their disciplinary ticket waives their right to a hearing over the disciplinary ticket. (Benty, Doc. 35, PageID1070; Ticket, Doc. 27-18 and 35-1; Thurkill, Doc. 27, PageID359, 365-66).

32.  Inmates at the Butler County Jail who request a hearing over their disciplinary ticket are afforded at least 24 hours to prepare their defense. (Thurkill, Doc. 27, PageID359; Morgan, Doc. 29, PageID643; Benty, Doc. 35, PageID1063).

33.  If an inmate at the Butler County Jail is placed into pre-disciplinary isolation prior to the requested hearing over their disciplinary ticket, the hearing must occur within 48 hours of the disciplinary ticket's issuance. (Thurkill, Doc. 27, PageID359-60).

34.  Inmates at the Butler County Jail who are not placed into pre-disciplinary isolation prior to the requested hearing over their disciplinary ticket must have their hearing conducted within 72 business hours of the disciplinary ticket's issuance. (Thurkill, Doc. 27, PageID360; Benty, Doc. 35, PageID1063).

35.  Mr. Benty declined to press any criminal charges against Mr. Felix regarding the May 29, 2019 altercation despite Mr. Felix allegedly "throw[ing] a punch." (Benty, Doc. 35, PageID1067, 1070).

36.  Mr. Benty did not observe Mr. Felix's disciplinary hearing over the May 29, 2019 inmate altercation and has no personal knowledge of the details of Mr. Felix's disciplinary hearing over the May 29, 2019 inmate altercation. (Benty, Doc. 35, PageID1071).

37.  Neither Sgt. Thurkill nor Corrections Officer Morgan conducted or was involved in Mr. Felix's disciplinary hearing over the May 29, 2019 inmate altercation. (Thurkill, Doc. 27, PageID441; *see also* id. at PageID375).

38.  There is no particular room in which hearings over disciplinary tickets are customarily held for H Pod inmates at the Butler County Jail. (Benty, Doc. 35, PageID1071; *see also* Thurkill, Doc. 27, PageID364-65, 367-68, 381, 403 ("there's no one set place to have the hearings"); Rule 30(b)(6), Doc. 33, PageID965).

39.  At the Butler County Jail, hearings over disciplinary tickets are conducted in the late evening. (Benty, Doc. 35, PageID1072 ("they are held in the evening"); Thurkill, Doc. 27,

PageID368-69 ("we try to do it right before midnight"); Morgan, Doc. 29, PageID648 ("they try to do it before midnight, so that way, at midnight, that starts their like sentencing"); Rule 30(b)(6), Doc. 33, PageID965 ("Generally we do them on night shift.")).

40. Mr. Benty's hearing over his May 29, 2019 disciplinary ticket was conducted the night of May 30, 2019, at approximately 11:30pm, by Sgt. Thurkill in the sallyport of the H Pod. (Thurkill, Doc. 27, PageID373-75; Thurkill Report, Doc. 27-19; *see also* Morgan Report, Doc. 27-20; Benty, Doc. 35, PageID1066, 1072-73).

41. Prior to the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket, Sgt. Thurkill had never met or interacted with Mr. Benty. (Thurkill, Doc. 27, PageID450).

42. Prior to the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket, there had been no problem between Corrections Officer Morgan and Mr. Benty. (Morgan, Doc. 29, PageID657, 710-11 ("I don't even know if I had an interaction with him at all."); Benty, Doc. 35, PageID1098).

43. Corrections Officer Morgan came to Mr. Benty's H Pod cell to escort Mr. Benty to the H Pod sally port for his hearing over the May 29, 2019 disciplinary ticket. (Benty, Doc. 35, PageID1073; Thurkill, Doc. 27, PageID378-79).

44. Corrections Officer Morgan escorted Mr. Benty from his H Pod cell to the H Pod sally port where Sgt. Thurkill was standing with paperwork for the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket. (Benty, Doc. 35, PageID1077-78; *see also* Thurkill, Doc. 27, PageID381-82).

45. Mr. Benty was housed in a cell in the H2 Pod, which "was a disciplinary segregation pod," and hearings over disciplinary tickets cannot be conducted inside the H2 Pod due to the behaviors of those inmates. (Thurkill, Doc. 27, PageID401, 403; *see also* Morgan, Doc. 29, PageID663 ("I got him from H2"), 647).

46. Prior to the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket, Sgt. Thurkill checked for any video footage of the May 29, 2019 inmate altercation between Mr. Benty and Mr. Felix, but no such video footage was located. (Thurkill, Doc. 27, PageID419-22).

47. The May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket was conducted in the H Pod sally port in front of the control room window, behind which at least one corrections officer was stationed. (Benty, Doc. 35, PageID1075; Thurkill, Doc. 27, PageID379, 414; Morgan, Doc. 29, PageID665, 671-72; Shift Assignment, Doc. 39-2 (showing control room staffed); McCampbell, Doc. 46-4, PageID1405; Eiser, Doc. 50, PageID1762).

48. The corrections officer(s) located in the control room can see through the control room window and observe the spot where Mr. Benty's May 30, 2019 hearing over his May 29,

2019 disciplinary ticket was conducted. (Thurkill, Doc. 27, PageID379, 415; Morgan, Doc. 29, PageID665, 672 (control room "officers can see out of the booth")).

49. The May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket was conducted in the H Pod sally port in front of the control room window on one side of the sally port and large windows looking out into populated inmate areas on the other side of the sally port. (Benty, Doc. 35, PageID1075-76; Thurkill, Doc. 27, PageID374, 398-400 ("And the doors all have glass in them too, so it's essentially an all-glass front."), 402-03 (the area is within "eyeshot of the H2 guys," who can see through the "glass windows"), 413 (inmates can see through the windows), 416).

50. The location of Mr. Benty's May 30, 2019 hearing over his May 29, 2019 disciplinary ticket was viewable to H2 inmates and officer(s) inside the control room, as well as via the surveillance cameras recording the H Pod sally port. (Benty, Doc. 35, PageID1075-76; Thurkill, Doc. 27, PageID374, 379, 398-400, 402-03 (the area is within "eyeshot of the H2 guys," who can see through the "glass windows"), 413 (inmates can see through the windows), 414-17; Morgan, Doc. 29, PageID648-49, 665, 671-72; Shift Assignment, Doc. 39-2; McCampbell, Doc. 46-4, PageID1366; Eiser, Doc. 50, Page1773).

51. There were at least two large cameras above the location of the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket, which streamed live video footage onto the control room monitors. (Thurkill, Doc. 27, PageID369-370, 374 (the H1 sally port has "lots of windows and several cameras in it"), 379 ("you got two big, old cameras on the ceiling above you over here and I think one in the corner"), 398 ("That's the H1 sally port. And that's where they got the cameras[.]"), 399, 416-417 ("There's two right above and I think there's one in the corner…and then there's two right in the middle."); *see also* Morgan, Doc. 29, PageID648-649; *see also* Benty, Doc. 35, PageID1078 (Mr. Benty saying only, "Usually they should be there, but I'm not for sure if they had cameras in that corridor, I'm not 100 percent sure.")).

52. The surveillance cameras inside the Butler County Jail constantly stream live footage to the monitors in central control; however, not all of the cameras automatically save the footage onto the system for playback. (Thurkill, Doc. 27, PageID272, 369-71; Morgan, Doc. 29, PageID648-49; *see also* Rule 30(b)(6), Doc. 33, PageID946-67, 965; McCampbell, Doc. 46-4, PageID1366; Eiser, Doc. 50, PageID1762).

53. Corrections officers at the Butler County Jail do not know, on any given day, which of the jail's surveillance cameras are automatically saving the footage to the system for playback. (Thurkill, Doc. 27, PageID369-71; Morgan, Doc. 29, PageID648-50, 653-54; Rule 30(b)(6), Doc. 33, PageID965; *see also* McCampbell, Doc. 46-4, PageID1390, 1399).

54. Corrections officers at the Butler County Jail, like Sgt. Thurkill and Corrections Officer Morgan, always assume their actions are "being recorded." (Thurkill, Doc. 27, PageID369-71; s*ee also* Morgan, Doc. 29, PageID653-54 ("You always are supposed to assume that there's a camera on you. You're told that from the administration as well, that there's always a camera[.]")).

55.     The corrections officer(s) stationed in the control room manually activate the recording function to save the camera footage onto the system for the cameras that do not automatically save their footage to the system for playback. (Rule 30(b)(6), Doc. 33, PageID695; *see also* Thurkill, Doc. 27, PageID371; Morgan, Doc. 29, PageID649).

56.     At the Butler County Jail, it is expected that corrections officers will make every attempt to record a use of force and save the footage onto the system; however, there is not always an opportunity to request the activation of the recording function to save the camera footage onto the system in a rapidly evolving situation. (Rule 30(b)(6), Doc. 33, PageID965-67; Morgan, Doc. 29, PageID649, 653-54).

57.     Mr. Benty did not voice any concern about the location of his May 30, 2019 hearing over his May 29, 2019 disciplinary ticket prior to or during the hearing. (Morgan, Doc. 29, PageID675; Thurkill, Doc. 35, PageID379, 383-84).

58.     Neither Sgt. Thurkill nor Corrections Officer Morgan had any expectation that force would be used during the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket or that there would be any issue during the hearing. (Thurkill, Doc. 27, PageID382-83, 388 ("It wasn't expected."); Morgan, Doc. 29, PageID657; McCampbell, Doc. 46-4, PageID1403).

59.     The May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket started by Sgt. Thurkill reading aloud the report of the May 29, 2019 inmate altercation. (Thurkill, Doc. 27, PageID385 ("I read the report and gave him a chance to explain his parts of the report."); Morgan, Doc. 29, PageID675; Benty, Doc. 35, PageID1085, 1086).

60.     Mr. Benty was agitated and annoyed at the May 30, 2019 hearing. (Morgan, Doc. 29, PageID678; Morgan Report, Doc. 27-20; Benty, Doc. 35, PageID#1080-81; *see also* Thurkill, Doc. 27, PageID385 ("He was getting upset because his version wasn't making sense with what was on the sheet of paper for his accusation, okay, and he was getting ticked off because I kept wanting him to explain himself[.]"), 423, 430, 442 ("He's angry because I'm not seeing his way, which is understandable, but he still can't be acting like that.")).

61.     During the hearing, Sgt. Thurkill asked Mr. Benty why he was being argumentative. (Benty, Doc. 35, PageID1081; Thurkill, Doc. 27, PageID423-24, 430; Thurkill Report, Doc. 27-19).

62.     Sergeant Thurkill initially "sympathized with [Mr. Benty's] frustrations" during the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket. (Thurkill, Doc. 27, PageID423).

63.     After the May 30, 2019 hearing, Mr. Benty apologized over the jail's kiosk for his "argumentative nature during the course of [his] hearing." (Kiosk, Doc. 39-3 (cleaned up); *see also* Fisher, Doc. 31, PageID791 ("I checked an apology letter from Inmate Benty apologizing for his actions and disrespectful nature that night."), 808 (Mr. Benty "apologized for his actions during there on the kite system"); Rule 30(b)(6), Doc. 33,

PageID945-46 ("[t]he Inmate Service Request from Mr. Benty apologizing for his actions that night")).

64. During the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket, Sgt. Thurkill and Mr. Benty "talked back and forth" about what occurred during the May 29, 2019 inmate altercation between Mr. Benty and Mr. Felix. (Morgan, Doc. 29, PageID675; *see als*o Thurkill, Doc. 27, PageID385, 388-89, 426-27; Benty, Doc. 35, PageID1078, 1085-86).

65. During the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket, Sgt. Thurkill asked Mr. Benty what had happened during the event for which Mr. Benty was issued the May 29, 2019 disciplinary ticket. (Benty, Doc. 35, PageID1078 (Sgt. Thurkill "asked me what happened."); Thurkill, Doc. 27, PageID385, 388-89, 426-27).

66. During the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket, Mr. Benty began to share his account of the May 29, 2019 inmate altercation. (Benty, Doc. 35, PageID1078, 1085-86; Thurkill, Doc. 27, PageID385, 388-89, 424, 426-27).

67. The disciplinary hearing process at the Butler County Jail involves an opportunity for the inmate to explain "their side of the story" and "justify either their behavior or not." (Thurkill, Doc. 27, PageID362; *see also* id. at PageID375-76, 388, 425; Benty, Doc. 35, PageID1078 (Sgt. Thurkill "asked me what happened.")).

68. A corrections officer, like Sgt. Thurkill, cannot let "inmates just tell me I should believe them," and the disciplinary hearing process is not in place to permit inmates to tell corrections officers what to do. (Thurkill, Doc. 27, PageID425).

69. From the perspective of Sgt. Thurkill and Corrections Officer Morgan, Mr. Benty was becoming rude," "disruptive and yelling[.]" (Thurkill, Doc. 27, PageID385; *see also* id. at PageID387-88, 426-27, 432; Morgan, Doc. 29, PageID675 ("Inmate Benty was becoming - - like interrupting [Sgt. Thurkill]."), 677-78; Internal Investigation Letter, Doc. 27-22, PageID543; Eiser, Doc. 50, 1779).

70. From the perspective of Sgt. Thurkill and Corrections Officer Morgan, Mr. Benty's behavior was disruptive, which escalated the situation and posed a jail security threat. (Thurkill, Doc. 27, PageID385, 387, 426, 432, 451-52; Morgan, Doc. 29, PageID698; *see also* Internal Investigation Letter, Doc. 27-22, PageID543; Eiser, Doc. 50, PageID1773-74, 1776, 1779).

71. An inmate's body language and/or physical cues can signal that the inmate is a potential threat to safety and/or jail security. (Morgan, Doc. 29, PageID611; *see also* Thurkill, Doc. 27, PageID254).

72. Examples of inmate body language and/or physical cues that signal a threat to safety and/or jail security are clenched fists, clenched jaw, pacing, "throwing punches in the air," and "bold body language." (Morgan, Doc. 29, PageID611-12; *see also* id. at PageID698; Thurkill, Doc. 27, PageID259-61; Rule 30(b)(6), Doc. 33, PageID952).

73. An inmate's noncompliance with officer commands is a form of aggression that poses a threat to safety and/or security. (Morgan, Doc. 29, PageID613 (threat to officer safety "as well as the general safety and control of the facility"), 698 ("noncompliance is an act of aggression" and "[i]nmates are not free to go where they want in the jail"); Thurkill, Doc. 27, PageID254-55, 258, 426, 451-52; Rule 30(b)(6), Doc. 33, PageID954; Eiser, Doc. 50, PageID1748-52, 1773-74; McCampbell, Doc. 46-4, PageID1391-92).

74. Inmate noncompliance in a jail poses a significant risk to the "basic needs to control the facility." (Rule 30(b)(6), Doc. 33, PageID954; *see also* Thurkill, Doc. 27, PageID264-66, 387, 426, 451-52; McCampbell, Doc. 46-4, PageID1391-92; Eiser, Doc. 50, PageID1748-52).

75. It is a proper jail objective to maintain inmate discipline within the facility. (McCampbell, Doc. 46-4, PageID1356, 1379-80, 1391-92).

76. Sergeant Thurkill attempted to de-escalate the situation on May 30, 2019 by "trying to give [Mr. Benty] a chance to calm down" before Mr. Benty returned to the H2 Pod. (Thurkill, Doc. 27, PageID385-86; *see also* Eiser, Doc. 50, PageID1748, 1773-74).

77. When Mr. Benty walked away from Sgt. Thurkill and Corrections Officer Morgan toward the end of the May 30, 2019 hearing, Sgt. Thurkill ordered Mr. Benty to return. (Thurkill, Doc. 27, PageID427; Thurkill Report, Doc. 27-19; Morgan, Doc. 29, PageID679-80; Morgan Report, Doc. 27-20; Internal Investigation Letter, Doc. 27-22, PageID543; Investigation File, Doc. 39-1, PageID1199-1203; *see also* Benty, Doc. 35, PageID1080 ("I don't remember much after that as far as what was said and what was not said."), 1093-94 (Mr. Benty testifying only that he does not remember or did not hear commands issued to him during or immediately after the hearing)).

78. At the time Sgt. Thurkill ordered Mr. Benty to return to where Sgt. Thurkill was standing, Sgt. Thurkill thought Mr. Benty was going to "be a disruption" in his housing unit, "which could have developed into something else." (Thurkill, Doc. 27, PageID432; *see also* id. at PageID385, 426, 433; Morgan, Doc. 29, PageID698; Eiser, Doc. 50, PageID1773-74).

79. When Mr. Benty did not return to the spot in the H Pod sally port where St. Thurkill was standing for the May 30, 2019 hearing, Sgt. Thurkill instructed Corrections Officer Morgan to bring Mr. Benty back to that same spot. (Thurkill, Doc. 27, PageID385-86; Morgan, Doc. 29, PageID679-80; Internal Investigation Letter, Doc. 27-22, PageID543; Investigation File, Doc. 39-1, PageID1200-03).

80. Mr. Benty does not know which corrections officer made the first physical contact with him during the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket. (Benty, Doc. 35, PageID1089-91 ("I didn't know who grabbed me first.")).

81.     Mr. Benty does not remember the specific actions Sgt. Thurkill allegedly took during the May 30, 2019 use of force versus the specific actions Corrections Officer Morgan allegedly took during the same event. (Benty, Doc. 35, PageID1078-79, 1080, 1088, 1090-91).

82.     Mr. Benty does not remember how far away he was from the H Pod sally port door when physical contact was first made with him. (Benty, Doc. 35, PageID1091).

83.     After Mr. Benty started walking toward the H Pod sally port door, Corrections Officer Morgan attempted to make physical contact with Mr. Benty and it felt, to Corrections Officer Morgan, like Mr. Benty's arm pulled away from Corrections Officer Morgan. (Morgan, Doc. 29, PageID684; *see also* Morgan Report, Doc. 27-20; Thurkill, Doc. 27, PageID386, 430, 434-35, 438, 451; Thurkill Report, Doc. 27-19; Eiser, Doc. 50, Page ID1744, 1746).

84.     Sergeant Thurkill used a balance displacement technique and physical commands to redirect Mr. Benty against a wall in the H Pod sally port whereby Mr. Benty's left shoulder was the first part of Mr. Benty's body to make contact with the wall. (Thurkill Report, Doc. 27-19; Thurkill, Doc. 27, PageID436-37, 438; Morgan, Doc. 29, PageID686-89; *see also* Thurkill, Doc. 27, PageID152-54 (describing balance displacement); Morgan Report, Doc. 27-20; Subject Management Report, Doc. 27-21, PageID540-51; Investigation File, Doc. 39-1, PageID1198-1203; Eiser, Doc. 50, PageID1746-47, 1757-58).

85.     Balance displacement is "a general technique where you just attempt to get the inmate off their balance." (Morgan, Doc. 29, PageID622; *see also* Thurkill, Doc. 27, PageID152-54, 284; Fisher, Doc. 31, PageID783-84; Eiser, Doc. 50, PageID1752-54).

86.     Given the chance of injury resulting from a takedown, "stabiliz[ing]" and inmate "on the wall" can be a safer alternative for gaining inmate compliance. (Thurkill, Doc. 27, PageID285-86; *see also* Eiser, Doc. 50, PageID1746-47, 1752-54 (stabilizing an inmate against the wall is a good option when "you don't want to take to the ground…because it may hurt him"), 1776).

87.     Corrections officers at the Butler County Jail are trained to "default to the least level of [force needed.]" (Thurkill, Doc. 27, PageID182; *see also* id. at PageID154, 256-57, 267, 278, 286, 340 ("We're taught to be gentle…We're taught to be not overly aggressive but we're supposed to use the least amount of force necessary."); Fisher, Doc. 31, PageID775; Policy, Doc. 27-9, PageID508, 511; Policy, Doc. 31-1, PageID833, 836 ("Only the response to resistance necessary to subdue the individual shall be used in each circumstance and nothing more."); Rule 30(b)(6), Doc. 33, PageID863-64; Post Order, Doc. 39-4).

88.     Corrections officers at the Butler County Jail are trained to use the least amount of force necessary. (Thurkill, Doc. 27, PageID340; *see also* id. at PageID162 ("dealing with the inmates, once again, this is the least amount of force possible that's necessary to control them"), 267; Fisher, Doc. 31, PageID775 (the standard for responding to resistance is "[w]ith the least amount of force as necessary to control the situation"); Rule 30(b)(6), Doc. 33, PageID863-64; Policy, Doc. 27-9, PageID508, 511; Policy, Doc. 31-1, PageID833, 836; Post Order, Doc. 39-4).

89.     The Butler County Sheriff's Office Corrections Division Post Order on use of force instructs, "Use of force shall be limited to the amount of force necessary to control a given situation[.]" (Post Order, Doc. 39-4).

90.     The Butler County Sheriff's Office Policy on Response to Resistance states, "Employees may only use tactics that are objectively reasonable to affect lawful objectives." (Policy, Doc. 27-9, PageID504; Policy, 31-3, PageID829; *see also* Policy, Doc. 27-9, PageID508 ("only the response to resistance that is objectively reasonably necessary" may be used); Thurkill, Doc. 27, PageID267; Morgan, Doc. 29, PageID614; Rule 30(b)(6), Doc. 33, PageID863, 950).

91.     The Butler County Sheriff's Office Policy on Response to Resistance guides corrections officers to utilize de-escalation. (Policy, Doc. 27-9, PageID507-08; Policy, Doc. 31-3, PageID832-33; *see also* Fisher, Doc. 31, PageID775 ("You should attempt to de-escalate a situation before using force.")).

92.     Corrections officers at the Butler County Jail know that they must "do your best to try to de-escalate a situation first before using force." (Thurkill, Doc. 27, PageID253; *see also* Fisher, Doc. 31, PageID775).

93.     The Butler County Sheriff's Office Policy on Response to Resistance explains, "Only the response to resistance necessary to subdue the individual shall be used in each circumstance and nothing more." (Policy, Doc. 27-9, PageID511; Policy, Doc. 31-3, PageID836; *see also* Thurkill, Doc. 27, PageID267; Morgan, Doc. 29, PageID614; Fisher, Doc. 31, PageID775).

94.     The Butler County Sheriff's Office Policy on Response to Resistance lays out the acceptable "Levels of Response to Resistance," or a use of force continuum. (Policy, Doc. 27-9, PageID508-17; Policy, Doc. 31-3, PageID833-42; *see also* Fisher, Doc. 31, PageID775).

95.     Corrections officers at the Butler County Jail have demonstrated their understanding of the "Levels of Response to Resistance," or the use of force continuum. (Thurkill, Doc. 27, PageID207, 254-62, 284-85; Fisher, Doc. 31, PageID775-78).

96.     Sergeant Thurkill approached Mr. Benty's right side and pushed Mr. Benty by "his shoulder…into the wall literally shoulder first" such that Mr. Benty's left shoulder was the first part of Mr. Benty's body to make contact with the wall in the H Pod sally port. (Thurkill, Doc. 27, PageID435; *see also id.* at PageID436, 438; Morgan, Doc. 29, PageID684, 689-90; Thurkill Report, Doc. 27-19; Morgan Report, Doc. 27-20; Investigation File, Doc. 39-1, PageID1198-1203).

97.     Sergeant Thurkill essentially extended his arms "and used his hands" to "push straight out" into Mr. Benty's right shoulder so that Mr. Benty's left shoulder made contact with the wall in the H Pod sally port. (Morgan, Doc. 29, PageID689-90 ("He lost his balance and went shoulder first and then just kind of like sat down."); *see also* Thurkill, Doc. 27, PageID435-

11

437, 438; Thurkill Report, Doc. 27-19; Morgan Report, Doc. 27-20; Investigation Letter, Doc. 27-22, PageID543; Investigation File, Doc. 39-1, PageID1198-1203).

98.   Mr. Benty was approximately three to four feet away from the wall when the force was used that caused Mr. Benty's left shoulder to make contact with a wall in the H Pod sally port. (Thurkill, Doc. 27, PageID435; Morgan, Doc. 29, PageID690-91).

99.   The situation involving the use of force during Mr. Benty's May 30, 2019 hearing over the May 29, 2019 disciplinary ticket evolved rapidly. (Benty, Doc. 35, PageID1091 ("it happened fast"); Morgan, Doc. 29, PageID683-689 ("it happened very fast"); *see also* Eiser, Doc. 50, PageID1748).

100.  Mr. Benty estimated the May 30, 2019 use of force lasting "[a]bout a minute, 60 seconds." (Benty, Doc. 35, PageID1092; *see also* Eiser, Doc. 50, PageID1746).

101.  The May 30, 2019 use of force was not employed as a form of discipline or punishment against Mr. Benty. (Thurkill, Doc. 27, PageID253, 275; Morgan, Doc. 29, PageID610).

102.  All forced ceased when Mr. Benty sat on the ground against a wall in the H Pod sally port. (Thurkill Report, Doc. 27-19; Thurkill, Doc. 27, PageID386-87, 439; Morgan, Doc. 29, PageID690, 699-92, 701; Morgan Report, Doc. 27-20; Investigation File, Doc. 39-1, PageID1200-03; Benty, Doc. 35, PageID1092).

103.  The Butler County Sheriff's Office Policy on Response to Resistance instructs, "When it is objectively reasonable to believe that a subject is under the deputy's control, the applicable force must be terminated." (Policy, Doc. 27-9, PageID508; Policy, Doc. 31-3, PageID833).

104.  The Butler County Sheriff's Office Policy on Response to Resistance requires corrections officers to intervene to stop excessive or improper force by their colleague(s), if it is observed. (Policy, Doc. 27-9, PageID513-14; Policy, Doc. 31-3, PageID838-39; *see also* Fisher, Doc. 31, PageID778).

105.  The Butler County Sheriff's Office Policy on Response to Resistance requires corrections officers to immediately notify their supervisor if they become aware of excessive or improper force and/or "a reportable response to resistance incident that was not reported." (Policy, Doc. 27-9, PageID513-14; Policy, Doc. 31-1, PageID838-39).

106.  From the May 30, 2019 hearing, Mr. Benty was issued 60 days in isolation for the violations listed on his May 29, 2019 disciplinary ticket. (Thurkill, Doc. 27, PageID386-87; Ticket, Doc. 27-18 and 35-1; *see also* Benty, Doc. 35, PageID1084-86; Thurkill Report, Doc. 27-19).

107.  Inmates at the Butler County Jail are allowed to appeal the decision that results from the hearing over their disciplinary ticket, but Mr. Benty did not appeal the 60 days in isolation he was issued during the May 30, 2019 disciplinary hearing. (Thurkill, Doc. 27, PageID362-63; Morgan, Doc. 29, PageID643; Kiosk, Doc. 93-3).

108.　Mr. Benty did not file an inmate grievance regarding his May 30, 2019 disciplinary hearing or the use of force. (*See* Kiosk, Doc. 93-3).

109.　On June 6, 2019, Mr. Benty submitted an entry over a kiosk in the Butler County Jail stating that the "situation has been resolved" and "[I] accept my 60 day sentence." (Kiosk, Doc. 93-3).

110.　Mr. Benty was granted early release from his 60 days in isolation that was imposed during the May 30, 2019 disciplinary hearing, and Mr. Benty was released from isolation on June 20, 2019. (Benty, Doc. 35, PageID1100).

111.　Mr. Benty was physically able to walk back to his cell, unassisted, after the May 30, 2019 hearing over his May 29, 2019 disciplinary ticket concluded. (Benty, Doc. 35, PageID1093; *see also* Thurkill, Doc. 27, PageID386, 440 ("he got up and went back to his cell")).

112.　Mr. Benty was not bleeding or in need of stitches after the May 30, 2019 hearing over his May 29, 2019 disciplinary ticket. (Benty, Doc. 35, PageID1094).

113.　Mr. Benty had no facial injuries from the May 30, 2019 hearing over his May 29, 2019 disciplinary ticket. (Benty, Doc. 35, PageID1095).

114.　Mr. Benty did not cry in front of Sgt. Thurkill or Corrections Officer Morgan during or after the May 30, 2019 use of force. (Thurkill, Doc. 27, PageID386, 389, 431; *see also* Benty, Doc. 35, PageID1092, 1094).

115.　Mr. Benty was evaluated by a medical professional after the May 30, 2019 hearing over his May 29, 2019 disciplinary ticket. (Thurkill, Doc. 27, PageID391; Thurkill Report, Doc. 27-19; Benty, Doc. 35, PageID1094-95; *see also* Eiser, Doc. 50, PageID1755-56).

116.　An x-ray of Mr. Benty's clavicle was ordered by a Butler County Jail medical professional after the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket, and Mr. Benty had a fractured clavicle. (Thurkill, Doc. 27, PageID391; Morgan Report, Doc. 27-20; Benty, Doc. 35, PageID1095).

117.　The Butler County Jail transported Mr. Benty to Oxford, Ohio to undergo a surgery on June 7, 2019 and Mr. Benty was cleared by the orthopedic doctor to return to the Butler County Jail that same day. (Benty, Doc. 35, PageID1095-96).

118.　After returning to the Butler County Jail from receiving medical attention at an outside facility, Mr. Benty signed a form requesting to stop his prescribed pain medication and to move out of the jail's medical unit. (Benty, Doc. 35, PageID1096-97).

119.　Mr. Benty voluntarily chose to stop receiving the prescription pain medication that was provided to him at the Butler County Jail. (Benty, Doc. 35, PageID1096-97).

120. After Plaintiff voluntarily chose to stop receiving the prescription pain medication that was provided to him at the Butler County Jail, Mr. Benty was provided over-the-counter pain medication. (Benty, Doc. 35, PageID1097).

121. Sergeant Thurkill did not use any racial slur toward Mr. Benty. (Benty, Doc. 35, PageID1092-93).

122. Sergeant Thurkill is an African American male. (Benty, Doc. 35, PageID1109; *see also* id. at PageID1093).

123. Mr. Benty is not pursuing a Fourteenth Amendment Equal Protection claim against Sgt. Thurkill. (Plf. Opp. to MSJ, Doc. 58, PageID2220-22).

124. Mr. Benty has not witnessed Corrections Officer Morgan use force against another inmate. (Benty, Doc. 35, PageID1098)

125. Mr. Benty has not witnessed Sgt. Thurkill use force against another inmate. (Benty, Doc. 35, PageID1098)

126. Mr. Benty's May 30, 2019 hearing over his May 29, 2019 disciplinary ticket was the only disciplinary hearing in which Sgt. Thurkill used force. (Thurkill, Doc. 27, PageID431; *see also* id. at PageID382 ("Usually most hearings go swimmingly. There are usually no - - no major issues.")).

127. An inmate who is yelling and cursing in front of other inmates is disruptive, which is detrimental to the control of the facility and/or the safety of inmates and officers. (Thurkill, Doc. 27, PageID387, 426, 433; *see also* Rule 30(b)(6), Doc. 33, PageID954; Morgan, Doc. 29, PageID698; Eiser, Doc. 1751-52, 1773-74, 1776).

128. Upon his release from the Butler County Jail, Mr. Benty was booked into the Correction Reception Center ("CRC") to be processed through the state prison system. (Benty, Doc. 35, PageID1051-52).

129. Upon his 2019 release from the Butler County Jail, Mr. Benty moved to the Correctional Reception Center ("CRC"), then to Madison Correctional Institution, and then to Belmont Correctional Institution. (Benty, Doc. 35, PageID1051-52).

130. While in the custody of the Ohio Department of Rehabilitation and Correction, Mr. Benty received nothing more than "[s]omething similar to ibuprofen" to address the clavicle injury he allegedly sustained in the Butler County Jail. (Benty, Doc. 35, PageID1052-53).

131. While in the custody of the Ohio Department of Rehabilitation and Correction, Mr. Benty was not transported to any outside medical facility in connection with the clavicle injury he allegedly sustained in the Butler County Jail. (Benty, Doc. 35, PageID1053).

132.    Mr. Benty was released from Belmont Correctional Institution in August 2020. (Benty, Doc. 35, PageID1040, 1047).

133.    The clavicle fracture Mr. Benty attributes to the May 30, 2019 disciplinary hearing is fully healed, as confirmed by Mr. Benty's orthopedic doctor, Bryan McCullough, on October 27, 2020. (Benty, Doc. 35, PageID1112-13).

134.    According to Mr. Benty's orthopedic doctor, Bryan McCullough, Mr. Benty has no activity restrictions. (Benty, Doc. 35, PageID1113-15; *see also* id. at PageID1095).

135.    Mr. Benty does not require assistance with activities of daily living. (Benty, Doc. 35, PageID1114).

136.    Mr. Benty's orthopedic doctor, Bryan McCullough, did not diagnose Mr. Benty with any injury other than a fractured clavicle. (Benty, Doc. 35, PageID1095).

137.    After his 2020 release from prison, Mr. Benty has treated with a chiropractor who advised that Mr. Benty will fully recover from his reported physical symptoms. (Benty, Doc. 35, PageID1115-16).

138.    No medical provider has advised Mr. Benty that he will experience lasting pain due to his previously fractured clavicle that he attributes to the May 30, 2019 disciplinary hearing. (Benty, Doc. 35, PageID1117).

139.    Mr. Benty was fired from his job at McDonalds in 2016 after he failed to return to work after a vacation, and Mr. Benty has remained unemployed since his 2016 termination from McDonalds. (Benty, Doc. 35, PageID1041-42, 1043).

140.    Mr. Benty has been involved in "[a]bout four" car accidents from which he received physical injuries and needed "to go through treatment." (Benty, Doc. 35, PageID1110).

141.    Mr. Benty has not fully recovered from one or more of his car accidents. (Benty, Doc. 35, PageID1111).

142.    After the May 30, 2019 hearing over Mr. Benty's May 29, 2019 disciplinary ticket, Mr. Benty had a subsequent disciplinary hearing, on June 6, 2019, regarding Mr. Benty's placement of a towel in a cell door that prevented the cell door from closing. (Benty, Doc. 35, PageID1059).

143.    Mr. Benty's June 6, 2019 disciplinary hearing was conducted in a hallway of H Pod, but Mr. Benty does not recall which officer(s) participated in the hearing nor what time of day the hearing was conducted. (Benty, Doc. 35, PageID1060-62).

144.    Mr. Benty does not have a specific recollection of his June 6, 2019 disciplinary hearing. (Benty, Doc. 35, PageID1060).

145.  Lying by a corrections officer is not tolerated at the Butler County Jail or by the Butler County Sheriff's Office administration. (Morgan, Doc. 29, PageID650-52; Thurkill, Doc. 27, PageID179 ("I think I had to go take a lie detector test"); Rule 30(b)(6), Doc. 33, PageID921-22 (suspension of officer for inaccurate depiction of event in report), 933-34 (termination of corrections officer because "[h]e was deceptive in the interview…by not giving all the information"); Sept. 2018 Cook Letter, Doc. 33-13; Suspension Letter, Doc. 33-12; *see also* March 2019 Cook Letter, Doc. 33-9 (reprimand for lack of report); McCampbell, Doc. 46-4, PageID1418-19).

146.  Corrections Officer Zach Gilbert was terminated from his employment at the Butler County Jail because "[h]e was deceptive" in an internal investigation interview over a use of force "by not giving all the information." (Rule 30(b)(6), Doc. 33, PageID933-34; *see also* Removal, Doc. 33-19).

147.  Corrections Officer Eric Cook was suspended for not writing an accurate report of his use of force. (Rule 30(b)(6), Doc. 33, PageID918-21; 36-Hour Suspension, Docs. 33-11 through 33-13; McCampbell, Doc. 46-4, PageID1418-19).

148.  Excessive force is not tolerated at the Butler County Jail or by the Butler County Sheriff's Office administration. (Policy, 27-9, PageID506, Policy, Doc. 31-3, PageID831; Policy, Doc. 31-3, PageID833, 836; Post Order, Doc. 39-4; Rule 30(b)(6), Doc. 33, PageID868-69 (disciplinary action taken for improper force); Morgan, Doc. 29, PageID589 ("You can't use excessive force."), 614; *see also* Rule 30(b)(6), Doc. 33, PageID934 (Corrections Officer Mann was terminated); Oct. 2020 Internal, Doc. 33-15 (discipline for premature takedown); Suspension Letter, Doc. 33-14 (56-hour suspension); Hamblin Discipline, Doc. 33-16; Jackson Suspension, Doc. 33-17; McCampbell, Doc. 46-4, PageID1401, 1418; Eiser, Doc. 50, PageID1799, 1802, 1804 (reviewed documents showing Butler County Jail corrections officers disciplined for force)).

149.  Corrections officers at the Butler County Jail who use improper force are disciplined and sometimes even terminated. (Thurkill, Doc. 27, PageID273-74; Rule 30(b)(6), Doc. 33, PageID869 (two officers "were terminated over use of force"), 923-26 (discussion of imposing a 56-hour suspension plus last-chance agreement), 927-28 ("he received a written reprimand because he could have used different tactics in that situation"); McCampbell, Doc. 46-4, PageID1401, 1418; *see also* Records of 36-Hour Suspension, Docs. 33-11 through 33-13; Suspension Letter, Doc. 33-14; Oct. 2020 Internal, Doc. 33-15 (discipline for premature takedown); Hamblin Discipline, Doc. 33-16; Jackson Suspension, Doc. 33-17).

150.  Corrections Officer Evan Mann was terminated for unnecessary force. (Rule 30(b)(6), Doc. 33, PageID869 ("He and another officer were terminated over use of force."), 934; McCampbell, Doc. 46-4, PageID1401).

151.  Corrections Officer Eric Cook was issued a 56-hour suspension and a three-year last chance agreement for unnecessary force. (Rule 30(b)(6), Doc. 33, PageID922-27).

16

152. Corrections Officer Rachael Jackson was issued a 56-hour suspension because she did not quickly enough terminate force. (Rule 30(b)(6), Doc. 33, PageID928-32; Jackson Suspension, Doc. 33-17 and 33-18; *see also* McCampbell, Doc. 46-4, PageID1418).

153. Corrections Officer Hamblin was issued a written reprimand over his use of force "because he could have used different tactics in that situation." (Rule 30(b)(6), Doc. 33, PageID27-28; *see also* Hamblin Discipline, Doc. 33-16).

154. In a September 2020 use of force review, Sgt. Thurkill determined that the corrections officer's takedown of an inmate was premature and the corrections officer was disciplined. (October 2020 Internal, Doc. 33-15).

155. Supervisors at the Butler County Jail who fail to "properly supervise a use of force incident" are disciplined. (Rule 30(b)(6), Doc. 33, PageID908; *see also* Supervisor Counseling, Doc. 33-6 and 33-7).

156. Racism is not tolerated at the Butler County Jail or by the Butler County Sheriff's Office administration. (Morgan, Doc. 29, PageID602, 604-05; Thurkill, Doc. 27, PageID440 (Sgt. Thurkill testifying that, if Corrections Officer Morgan had used a racial slur in front of him, "I would have had him fired.")).

157. Corrections Officer Morgan previously "turned in an officer who had said a racial comment" and that officer was disciplined. (Morgan, Doc. 29, PageID604-05; *see also* Errata, Doc. 29-1).

158. Butler County Sheriff's Office policy requires a corrections officer to complete a Subject Management Report "documenting the details of the incident, possible injuries, and any medical attention provided to the subject" if more than an escort position is used by the corrections officer. (Policy, 27-9, PageID511, 515, 518-20; Policy, Doc. 31-3, PageID836, 843-45).

159. A medical professional and a supervisor must be called after a use of force at the Butler County Jail. (Policy, Doc. 27-9, PageID514-15, Thurkill, Doc. 27, PageID269; Post Order, Doc. 39-4).

160. The Butler County Sheriff's Office Corrections Division Post Order on use of force requires that all "[u]se of force incidents shall be documented and reviewed by the jail administrator or designee." (Post Order, Doc. 39-4, PageID1209).

161. Corrections officers at the Butler County Jail who are involved in a use of force must document the situation by writing an incident report and completing a Subject Management Report. (Thurkill, Doc. 27, PageID267, 287; Policy, Doc. 27-9, PageID515, 518-20; Fisher, Doc. 31, PageID776-777); *see also* March 2019 Cook Letter, Doc. 33-9 (reprimand for lack of report)).

162.    The Butler County Sheriff's Office disciplines corrections officers who fail to submit the required documentation on a use of force. (March 2019 Cook Letter, Doc. 33-9 (reprimand for lack of report)).

163.    Corrections officers at the Butler County Jail who are involved in a use of force are questioned by their supervisor(s) about the use of force. (Thurkill, Doc. 27, PageID207, 209, 271 (the use of force review process "is essentially an investigation"), 273; Morgan, Doc. 29, PageID577-578, 613, 617).

164.    The Butler County Sheriff's Office Corrections Division Post Order on use of force instructs, "In no event is physical force used as punishment." (Post Order, Doc. 39-4; *see also* Thurkill, Doc. 27, PageID275; Morgan, Doc. 29, PageID610; Fisher, Doc. 31, PageID775).

165.    Corrections officers at the Butler County Jail understand that force can never be used against inmates as a form of punishment or discipline. (Thurkill, Doc. 27, PageID253, 275, 347; Morgan, Doc. 29, PageID610).

166.    Sergeant Thurkill and Corrections Officer Morgan each individually authored an incident report documenting the May 30, 2019 use of force involving Mr. Benty separate from one another. (Thurkill Report, Doc. 27-19; Morgan Report, Doc. 27-20; *see also* Thurkill, Doc. 27, PageID444-445; Morgan, Doc. 29, PageID631, 703-704).

167.    Sergeant Thurkill and Corrections Officer Morgan did not talk about or collaborate on the drafting of their respective incident reports documenting the May 30, 2019 use of force involving Mr. Benty. (Thurkill, Doc. 27, PageID444-445; Morgan, Doc. 29, PageID631, 703-704).

168.    A Subject Management Report was completed for the May 30, 2019 use of force involving Mr. Benty. (Subject Management Report, Doc. 27-21; *see also* Investigation File, Doc. 39-1, PageID1198-1201; Thurkill, Doc. 27, PageID444, 446; Morgan, Doc. 29, PageID631, 703).

169.    Sergeant Thurkill and Corrections Officer Morgan were questioned by supervisors about the May 30, 2019 use of force involving Mr. Benty. (Morgan, Doc. 29, PageID634, 641, 697-98, 706; Thurkill, Doc. 27, PageID207, 271).

170.    The use of force review process "is essentially an investigation." (Thurkill, Doc. 27, PageID271).

171.    The Subject Management Report completed for the May 30, 2019 use of force involving Mr. Benty was reviewed by five levels of supervision. (Investigation File, Doc. 39-1, PageID1201; *see also* Eiser, Doc. 50, PageID1795, 1805).

172.    Uses of force at the Butler County Jail are reviewed by a Sergeant, a Lieutenant, the Warden, the Major, and the Chief Deputy. (Rule 30(b)(6), Doc. 33, PageID872).

173.  If an inmate at the Butler County Jail submits a grievance over a corrections officer's use of force, a complaint on staff form is filed against the accused corrections officer for further investigation. (Thurkill, Doc. 27, PageID224-25, 306-07; Rule 30(b)(6), Doc. 33, PageID358).

174.  An internal investigation into the May 30, 2019 use of force involving Mr. Benty was opened and an investigation file on the May 30, 2019 use of force involving Mr. Benty was assembled by the Butler County Sheriff's Office administration. (Investigation File, Doc. 39-1; *see also* Internal Investigation letter, Doc. 27-22; Fisher, Doc. 31, PageID791).

175.  The Warden of the Butler County Jail, Captain Nick Fisher, conducted internal investigation interviews of Sgt. Thurkill and Corrections Officer Morgan regarding the May 30, 2019 use of force involving Mr. Benty. (Fisher, Doc. 31, PageID791-93; *see also* Thurkill, Doc. 27, PageID447; Morgan, Doc. 29, PageID706-07).

176.  During the internal investigation interviews, the Warden asked Sgt. Thurkill and Corrections Officer Morgan to "recount the events that led up to the use of force on Mr. Benty." (Fisher, Doc. 31, PageID793, 798; *see also* Thurkill, Doc. 27, PageID447; Morgan, Doc. 29, PageID706-07).

177.  During the internal investigation interviews, the Warden asked Sgt. Thurkill and Corrections Officer Morgan to demonstrate the force used against Mr. Benty on May 30, 2019. (Fisher, Doc. 31, PageID794; Morgan, Doc. 29, PageID616, 706).

178.  In addition to conducting internal investigation interviews, the Warden reviewed the narratives of Sgt. Thurkill and Corrections Officer Morgan regarding the May 30, 2019 use of force involving Mr. Benty, checked for related video footage, and considered the apology Mr. Benty submitted, on the jail's kiosk, for his "arguementative *[sic]* nature during the course of the hearing." (Kiosk, Doc. 39-3; Fisher, Doc. 31, PageID791, 793-94, 799, 808; Rule 30(b)(6), Doc. 33, PageID943-46, 972; *see also* Thurkill, Doc. 27, PageID272-73).

179.  The Warden reflected on the information gathered in the internal investigation and wrote a letter regarding the May 30, 2019 event to Major Michael Craft. (Fisher, Doc. 31, PageID791, 805; Investigation Letter, Doc. 27-22).

180.  While internal investigations are all uniquely different," the Butler County Sheriff's Office examines "the totality of the situation" to determine whether the corrections officer's conduct "was proper or improper based on the facts that you have and what the policy says." (Rule 30(b)(6), Doc. 33, PageID863, 895).

181.  In an internal investigation, the Butler County Sheriff's Office looks at whether discipline and/or additional training should be issued to the involved corrections officer(s). (Rule 30(b)(6), Doc. 33, PageID860-61).

182. All new hires at the Butler County Jail complete an orientation training where they review the Butler County Sheriff's Office Policies and Procedures, the Butler County Jail Post Orders, and the jail's protocols. (Morgan, Doc. 29, PageID580, 581, 608; Rule 30(b)(6), Doc. 33, PageID956).

183. Supervisors spend time with new hires during the orientation training to underscore important aspects of the policies, procedures, post orders, and protocols applicable at the Butler County Jail. (Morgan, Doc. 29, PageID581-83).

184. After the orientation training, new corrections officers at the Butler County Jail complete a field training officer ("FTO") program. (Thurkill, Doc. 27, PageID210-11; Morgan, Doc. 29, PageID583-88; Rule 30(b)(6), Doc. 33, PageID956).

185. As part of the Butler County Jail FTO program, the training officer must complete Daily Observation Reports and Weekly Status Reports documenting the trainee's progress and competency. (Thurkill, Doc. 27, PageID210-11; Morgan, Doc. 29, PageID584-88; *see also* DOR, Doc. 27-4 and 27-5; Weekly Report, Doc. 29-2).

186. The Butler County Jail FTO program addresses the constitutional limits of acceptable force and the need to write reports that "accurately depict the situation." (Rule 30(b)(6), Doc. 33, PageID955, 957-58; *see also* Thurkill, Doc. 27, PageID287).

187. Within the first year of employment, corrections officers at the Butler County Jail must complete a state-approved corrections academy, if they have not already satisfactorily completed one. (Rule 30(b)(6), Doc. 33, PageID956; *see also* id. at PageID959-62).

188. The state-approved corrections academy teaches on use of force. (Rule 30(b)(6), Doc. 33, PageID957-62; Thurkill, Doc. 27, PageID232 ("that's what they teach you in the academy"), 276 ("that did include subject management training"), 278-79; Fisher, Doc. 31, PageID779-80; Eiser, Doc. 50, PageID1770).

189. There is a state exam that must be passed to become a certified corrections officer through the Ohio Peace Officer Training Academy ("OPOTA"). (Thurkill, Doc. 33, PageID277; Morgan, Doc. 29, PageID618-19, 623; Fisher, Doc. 31, PageID779).

190. Sergeant Thurkill and Corrections Officer Morgan each completed "Hamilton County's 12-week corrections officer program," which is a state-approved corrections academy, prior to their employment at the Butler County Jail. (Thurkill, Doc. 27, PageID276; Morgan, Doc. 29, PageID618; *see also* Morgan, Doc. 29, PageID595).

191. Sergeant Thurkill is a certified corrections officer through OPOTA. (Thurkill, Doc. 27, PageID276; *see also* id. at PageID277-78).

192. In May 2019, Corrections Officer Morgan was a certified corrections officer through OPOTA. (Morgan, Doc. 29, PageID618-19, 623).

193. Sergeant Thurkill has been a corrections officer for approximately twenty years. (Thurkill, Doc. 27, PageID144 ("about 18 years total" at the time of his April 2022 deposition)).

194. Sergeant Thurkill served in the United States Army and was deployed to Iraq. (Thurkill, Doc. 27, PageID156-58, 159-60, 191; Errata, Doc. 27-1).

195. Sergeant Thurkill started his employment at the Butler County Jail in 2007. (Thurkill, Doc. 27, PageID166).

196. Corrections Officer Morgan was a corrections officer for approximately five years. (Morgan, Doc. 29, PageID557-58).

197. Corrections Officer Morgan started his employment at the Butler County Jail in 2019. (Morgan, Doc. 29, PageID563).

198. As part of the hiring process, the Butler County Sheriff's Office requires an applicant to complete paperwork, take a physical examination, take a polygraph examination, pass a drug test, and pass multiple rounds of interviews, and the Sheriff's Office also questions the applicant's neighbors and references about the applicant. (Thurkill, Doc. 27, PageID166-69,189-90; Morgan, Doc. 29, PageID563-65; *see also* Pre-employment Investigation, Doc. 27-3; Rule 30(b)(6), Doc. 33, PageID970-71).

199. If an applicant to work at the Butler County Jail has worked in another facility and/or for another law enforcement agency, the Butler County Sheriff's Office reviews the applicant's personnel, disciplinary, and use of force files from the prior employer(s). (Rule 30(b)(6), Doc. 33, PageID970-71).

200. Sergeant Thurkill was promoted from corrections officer to correction sergeant in 2018. (Thurkill, Doc. 27, PageID144, 193).

201. Employee promotions at the Butler County Jail are merit-based. (Thurkill, Doc. 27, PageID291, 193-94).

202. A corrections officer wanting to become a corrections sergeant at the Butler County Jail must pass written and oral examinations. (Thurkill, Doc. 27, PageID193).

203. A newly promoted corrections sergeant at the Butler County Jail must complete another FTO program during which Daily Observation Reports are utilized to document the newly promoted corrections sergeant's progress and competency. (Thurkill, Doc. 27, PageID211, 220; DOR, Doc. 27-4 and 27-5; Rule 30(b)(6), Doc. 33, PageID955).

204. During Sgt. Thurkill's Supervisor FTO program, Sgt. Thurkill was trained on "[a]nswering [an inmate grievance] professionally, in a way not to create liability for the agency, and based on policy and the overall best interests of the agency and the well-being of the inmate." (DOR, Doc. 27-4, PageID497).

205. The Supervisor FTO program instructs that "accurately depict[ing] the situation" when writing a report protects against civil liability. (Rule 30(b)(6), Doc. 33, PageID955).

206. The Supervisor FTO program instructs that "doing things correctly," in "compliance [with] policy and procedure,…help[s] minimize the distractions of civil liability to help us perform our jobs better." (Rule 30(b)(6), Doc. 33, PageID955-56).

207. Supervisors at the Butler County Jail review reports, review whether corrections officers are completing their tasks in compliance with the jail's policies and procedures, review whether corrections officers are up to date on their training requirements, review uses of force, provide guidance to corrections officers, give briefings, issue discipline to corrections officers, and lend assistance or backup. (Thurkill, Doc. 27, PageID201-04, 207-10; Morgan, Doc. 29, PageID575-78).

208. Corrections officers at the Butler County Jail are required to complete monthly training. (Morgan, Doc. 29, PageID597-98, 606-08; Thurkill, Doc. 27, PageID234-35, 246, 249; Rule 30(b)(6), Doc. 33, PageID957).

209. Part of the monthly training that corrections officers at the Butler County Jail are required to complete involves policy review. (Thurkill, Doc. 27, PageID249-51).

210. The Butler County Jail provides its corrections officers with in-person training on use of force and subject management. (Thurkill, Doc. 27, PageID251-52, 279-80, 288-89; Morgan, Doc. 29, PageID588, 592-93, 618; *see also* Thurkill, Doc. 27, PageID234 (trainings at Butler Tech)).

211. The Butler County Jail provides its corrections officers training on inmates' rights in the context of use of force. (Thurkill, Doc. 27, PageID279-81, 288-89; Rule 30(b)(6), Doc. 33, PageID958).

212. Corrections officers at the Butler County Jail are required to complete quizzes on subjects they receive training on, such as a "use of force and liability quiz," for example. (Thurkill, Doc. 27, PageID235, 246 ("We've had hundreds of trainings over the years, hundreds of quizzes."); *see also* McCampbell, Doc. 46-4, PageID1413-14, 1416).

213. Corrections officers at the Butler County Jail are required to complete online training. (Thurkill, Doc. 27, PageID234; Morgan, Doc. 29, PageID591-92; *see also* Training Log, Doc. 29-3).

214. Corrections officers at the Butler County Jail receive additional training during the daily briefings. (Thurkill, Doc. 27, PageID233 ("our daily training would be in briefings, like our daily briefings."); Morgan, Doc. 29, PageID581, 624 ("We touched topics in briefing every shift."); Rule 30(b)(6), Doc. 33, PageID957).

215. The Butler County Jail orientation training, FTO program, and "yearly training" teach corrections officers about proper use of force. (Rule 30(b)(6), Doc. 33, PageID957; *see also* Thurkill, Doc. 27, PageID206).

216. Use of force is the topic corrections officers at the Butler County Jail receive the most training on. (Morgan, Doc. 29, PageID578).

217. Corrections officers at the Butler County Jail receive training on report writing. (Thurkill, Doc. 27, PageID287; Rule 30(b)(6), Doc. 33, PageID955).

218. Corrections Officer Morgan was on the Correctional Emergency Response Team ("CERT") during his employment at the Butler County Jail. (Morgan, Doc. 29, PageID575, 581, 588).

219. At the Butler County Jail, corrections officers on the CERT team were required to complete extra monthly training. (Morgan, Doc. 29, PageID581, 588, 592, 600).

220. Corrections officers at the Butler County Jail who do not stay compliant with the requisite training are disciplined. (Thurkill, Doc. 27, PageID236-41; *see also* Reprimand, Doc. 27-6; Complaint on Staff, Doc. 27-7; Memo, Doc. 27-8).

221. The Butler County Sheriff's Office does not tolerate a corrections officer's failure to timely complete required training. (Reprimand, Doc. 27-6).

222. It is an unfortunate reality that use of force against inmates is sometimes necessary in a correctional facility. (Thurkill, Doc. 27, PageID148-49, 154; Eiser, Doc. 50, PageID1801; McCampbell, Doc. 46-4, PageID1356; *see also* Ohio Admin. Code §5120-9-01(A) ("As the legal custodians of a large number of potentially dangerous inmates, prison officials and employees are confronted with situations in which it may be necessary to use force to control inmates or respond to resistance.")).

223. It is difficult to manage inmates. (McCampbell, Doc. 46-4, PageID1395 ("[I]t's difficult to manage people in a jail environment…I very much respect corrections officers.")).

224. Inmates sometimes wrongly accuse corrections officers of excessive force. (Thurkill, Doc. 27, PageID155, 306-07, 318-19).

225. A corrections officer assigned to a post requiring frequent and direct interaction with inmates will most likely have more uses of force than an officer assigned to a post like central control, which does not involve in-person interaction with inmates. (McCampbell, Doc. 46-4, PageID1368-1370, 1372; Morgan, Doc. 29, PageID653; Eiser, Doc. 50, PageID1799-1800).

226. A corrections officer on a special response team, such as CERT, is placed in a position making them more likely to need to use force than corrections officers who are not part of

a special response team. (McCampbell, Doc. 46-4, PageID1370, 1402; Eiser, Doc. 50, PageID1799; Errata, Doc. 50-1, PageID1833).

227. The job of a corrections officer is a difficult one. (McCampbell, Doc. 46-4, PageID1395-96 ("It's a tough job.")).

228. The Butler County Sheriff's Office completed a full investigation into former inmate Brett McQueen's allegations against Sgt. Thurkill, which involved a recorded statement of Mr. McQueen taken by two detectives, a recorded interview of another inmate witness, an internal investigation interview of Sgt. Thurkill, a review of statements by other corrections officers, a review of jail records, and an investigation report. (April 2018 Investigation Memo, Doc. 27-14; McQueen Investigation Report, Doc. 27-15; Complaint on Staff, Doc. 58-2; *see also* Rule 30(b)(6), Doc. 33, PageID881-92; Thurkill, Doc. 27, PageID331-34 ("I was investigated for that")).

229. The Butler County Jail completed a full investigation into the allegations made by former inmates Bayong Brown Bayong and Ahmed Adem, and the FBI participated in the investigation, which involved interviews of Mr. Bayong, Mr. Adem, their attorneys, 22 officers (including former employees), and Mr. Bayong's wife, plus reviews of a statement by another inmate, a statement by the jail's dentist, and an x-ray of Mr. Bayong's mouth provided by the jail's dentist. (Bayong Investigation, Doc. 33-4; *see also* Rule 30(b)(6), Doc. 33, PageID895, 899-02, 910, 977).

230. The Butler County Jail's investigation into the allegations made by former inmates Mr. Bayong and Mr. Adem started November 3, 2020 and took until the end of January 2021 to complete. (Bayong Investigation, Doc. 33-4).

231. The Butler County Sheriff's Office provided information to U.S. Immigration and Customs Enforcement ("ICE") regarding the allegations made by former inmates Mr. Bayong and Mr. Adem. (Rule 30(b)(6), Doc. 33, PageID977).

232. At the time in question, the Butler County Jail received approximately three federal inspections a year, and an immigration officer monitored the Butler County Jail daily for compliance with federal standards. (Rule 30(b)(6), Doc. 33, PageID974-75, 976).

233. The Butler County Jail is inspected annually by the Ohio Department of Rehabilitation and Correction, Bureau of Adult Detention for compliance with the Ohio Minimum Jail Standards. (Rule 30(b)(6), Doc. 33, PageID977-78).

234. The Butler County Sheriff's Office has conducted an annual assessment, since at least 2018, of the aggregate uses of force to identify any potential patterns and/or needed policy changes. (Rule 30(b)(6), Doc. 33, PageID872-73, 876).

235. It is not possible for a jail's policies to account in writing for every scenario a corrections officer may encounter. (McCampbell, Doc. 46-4, PageID1398).

236. Plaintiff's expert witness Susan McCampbell has never been to the Butler County Jail. (McCampbell, Doc. 46-4, PageID1344).

237. Plaintiff's expert witness Susan McCampbell has "no experience working as a correctional officer." (McCampbell, Doc. 46-4, PageID1347).

238. Plaintiff's expert witness Susan McCampbell has never been personally involved in a use of force against an inmate. (McCampbell, Doc. 46-4, PageID1348).

Respectfully Submitted,

/s/ Angelica M. Jarmusz
Daniel T. Downey (0063753)
Angelica M. Jarmusz (0092249)
**FISHEL DOWNEY ALBRECHT & RIEPENHOFF LLC**
7775 Walton Parkway, Suite 200
New Albany, Ohio 43054
(614) 221-1216 - Telephone
(614) 221-8769 - Facsimile
ddowney@fisheldowney.com
ajarmusz@fisheldowney.com
*Attorneys for Defendants Butler County, Jeremiah C. Morgan and Joel Y. Thurkill*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing ***Defendants' Proposed Undisputed Facts*** was served, via the Court's CM/ECF system, upon all counsel this 11th day of September 2024.

/s/ Angelica M. Jarmusz
Angelica M. Jarmusz (0092249)
**FISHEL DOWNEY ALBRECHT & RIEPENHOFF LLC**
*Attorney for Defendants Butler County, Jeremiah C. Morgan and Joel Y. Thurkill*